Commonwealth ex rel. Truscott *v.* Philadelphia.

Argued November 22, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO, and ARNOLD, JJ.

*Marshall H. Morgan*, Special Counsel, with him *Robert L. Rubendall*, Deputy Attorney General, and *Frank F. Truscott*, Attorney General, for plaintiffs.

*Abraham L. Freedman*, City Solicitor, with him *Harvey Levin*, Deputy to City Solicitor, *Abraham Wernick*, Deputy City Solicitor and *Jerome J. Shestack*, First Deputy City Solicitor, for defendants.

*William A. Gray*, with him *Gray, Anderson & Schaffer*, for intervening plaintiffs.

OPINION BY MR. JUSTICE BELL, January 12, 1955:

The question presented is a narrow but very important one: Is the ordinance of Philadelphia's City Council which abolishes the Board of Revision of Taxes invalid because it violates the Constitution?

Philadelphia City Council passed on August 16, 1954 an ordinance which abolished the Board of Revision of Taxes and established new City offices to which it transferred all the functions and duties theretofore performed by the Board of Revision of Taxes. The Commonwealth of Pennsylvania, at the relation of the attorney-general, filed a complaint in equity to restrain the enforcement of the aforesaid ordinance, claiming it was void because (1) it violated the Constitution of Pennsylvania, and (2) it was an unauthorized usurpation of power, and therefore invalid. The City filed a responsive answer; no factual issues were raised; and this Court took original jurisdiction.

We start with the well-settled principle that municipalities are not sovereigns; they have no original or fundamental power of legislation; they have the power to enact only those ordinances which are authorized by the Constitution or by an enabling act of legislature: *Allentown School District Mercantile Tax Case*,

370 Pa. 161, 171, 87 A. 2d 480; *Genkinger v. New Castle,* 368 Pa. 547, 84 A. 2d 303; 1 Dillon on Municipal Corporations, 5th. Ed. 449.

The so-called Home Rule Amendment to the Constitution, Article XV, §1, adopted November 7, 1922, provided: "Cities . . . may be given [by the legislature] the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature."* *

Pursuant to the Home Rule Constitutional Amendment, the *General Assembly* enacted on April 21, 1949, P. L. 665, 53 PS §3421.1, the First Class City Home Rule Act which empowered cities to frame and adopt a charter for its own government, subject to the limitations and restrictions prescribed by the legislature and provided it was not inconsistent with the Constitution of Pennsylvania or of the United States.

Pursuant thereto a charter commission framed and the citizens of Philadelphia adopted a Charter providing for local self-government on April 17, 1951 which by its terms became effective on January 7, 1952. The City Charter, unless restricted by the legislature or the Constitution, is sufficiently broad to permit City Council to re-group and re-organize offices in the city government.

The people of Pennsylvania, not the people of Philadelphia, adopted on November 6, 1951 an amendment to the Constitution of Pennsylvania known as the City-County Consolidation Amendment, viz., Article XIV, §8 of the Constitution.

Since the Constitution of Pennsylvania is the supreme law of the Commonwealth—unless it contra-

---

* Italics, ours.

venes the Constitution of the United States—it is both wise and necessary to analyze and determine the pertinent provisions thereof, so far as they may affect or govern the question here involved.

Prior to the City-County Consolidation Amendment, Philadelphia had two governments, each of which was coextensive with the boundaries of the City of Philadelphia—a County government and a City government.

Paragraph or clause (1) of the City-County Consolidation Amendment provides: "In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law."

Paragraph or clause (7) of the Constitutional Amendment—and, of course, the Amendment must be read as a whole—provides: "Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms." It will be instantly noted that City Council is not mentioned in clause (7), and the City Charter, which was to take effect on January 7, 1952, is not mentioned. The Amendment specifies in the clearest imaginable language "General Assembly" not "City Council"; and "the laws of the Commonwealth" not "City ordinances" or "City Charter." Equally important and controlling, there was no City ordinance and no City Charter in effect at the time the

Constitutional Amendment became effective on November 6, 1951; so the words "in such manner as may be provided by . . . this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective," could not possibly be interpreted to mean the Charter of 1952 or the ordinance of 1954.

The clear and unmistakable meaning of clauses (1) and (7) of the Amendment when considered together is that all county offices as such are abolished by the Amendment and thenceforth the City shall perform all functions which were formerly considered functions of county government; and county offices and county officers shall be considered and operated as city offices and city officers, except that such officers shall continue to perform their duties and be elected or appointed, compensated and organized in accordance with the Constitution and the existing laws of the Commonwealth—not until the people of Philadelphia or the City Council shall otherwise provide, but—*"until the General Assembly shall otherwise provide."*

The language and meaning of the Constitutional Amendment is so clear that, to borrow the words of Chief Justice Stern in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496: If it is "read with an eye to their plain and unequivocal meaning instead of with a straining after forced constructions and a seeking of ambiguities where none exist . . . he who runs may read."

The meaning of the Constitutional Amendment is made doubly clear by the language of this Court in *Carrow v. Philadelphia,* 371 Pa., supra, and in *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834.

In *Carrow v. Philadelphia,* supra, Chief Justice Stern, speaking for the Court, said (pages 257, 258-259): "Article XIV, section 1, of the Constitution designated the Sheriff as a county officer, and, since

the employes in that office were not under civil service, they were subject to dismissal at the will of their employer. However, by the so-called City-County Consolidation Amendment, adding section 8 to Article XIV, which became effective when it was approved by the electorate on November 6, 1951, all county offices in Philadelphia were abolished and it was provided that all county officers should thereupon become officers of the City of Philadelphia, and, *until the General Assembly should otherwise provide,* * should continue to perform their duties and be elected, appointed, compensated and organized in such manner as might be provided by the Constitution and the laws of the Commonwealth in effect at the time the amendment became effective, the officers then serving to be permitted to complete their terms.

. . .

"As previously stated, the City-County Consolidation Amendment provided that, *until the legislature should otherwise provide, all the county officers should continue to perform their duties and those then serving should be allowed to complete their terms,* * but it will be noted that no provision was made in regard to the continuance in their positions of the employes of county offices. Accordingly that problem was dealt with in the new City Charter under the comprehensive authority granted to the city by the First Class City Home Rule Act. . . ."

In *Lennox v. Clark*, 372 Pa., supra, the Court specifically held that paragraph or clause (7) of the City-County Consolidation Amendment was self-executing and became effective immediately upon its adoption, to wit, November 6, 1951. This Court, again speaking through the Chief Justice, said (pages 363-4, 370):

---

* Italics, ours.

"We start with the City-County Consolidation Amendment itself. It provides in clause (1) that 'In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law.' The crucial words there to be noted are *'hereby'* and *'henceforth.'* The county offices are abolished, not at some indefinite time in the future when a legislative body might so enact, but *'hereby,'* that is, by virtue of the constitutional amendment itself, which in this respect, therefore, is obviously self-executing. It will be further noted that all the functions of county government, that is to say, all the activities or duties theretofore performed by the county officers, are *thenceforth* to be performed by the city; the city is to take over *then and there,* as part of its own government, the performance of the functions of the county government. This provision also is clearly self-executing. Clause (6) of the amendment provides: 'This amendment shall become effective *immediately upon its adoption.'* Clause (7) provides that 'Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia.' Here again the amendment is manifestly self-executing, for the change from county to city officers is to take place *upon adoption of the amendment*— which, incidentally, occurred on November 6, 1951— and therefore without the necessity of any further action, legislative or otherwise. Thus the county offices were effectually brought into the structure of the municipal government. And of course, when the county officers became city officers their employes automatically became thereby city employes. It is true that clause (7) further states that 'until the General Assembly shall otherwise provide,' the county officers [having now become officers of the City of Philadelphia] 'shall

continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, . . .'. In other words the county, now city, officers were to carry on their duties or functions just as before the transformation took place and *until such duties or functions should be changed by legislative action.* \* . . ."

It is crystal clear from the Constitutional Amendment itself, as well as from the aforesaid decisions of this Court, that no act of the Legislature or of City Council was necessary to abolish county offices; and no ordinance of City Council and no City Charter which was framed and adopted by the people of Philadelphia could transfer or change the duties and functions of former county officers because the *Constitutional Amendment itself clearly provided* that "all [former] county officers shall continue [as city officers] to perform their duties and be elected [or] appointed, compensated and organized, as may be provided by . . . existing laws *until the General Assembly shall otherwise provide.*" \*

The City now seeks to evade and nullify the clear language of the Constitutional Amendment—which, we deem it necessary to repeat, is the supreme law of Pennsylvania—by contending that the words "General Assembly" mean "City Council", i.e., "until the City Council shall otherwise provide." Such a contention is absolutely and completely devoid of merit.

The Constitution of Pennsylvania provides in Article II, §1: "The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."

---

\* Italics, ours.

Moreover, when the legislature twice passed the proposed Constitutional Amendment (of 1951) they knew, as they knew their ABC's, what was meant by the words "General Assembly". Furthermore, to pile Pelion on Ossa, for a hundred years the people of Pennsylvania have known that the words "General Assembly" mean the legislature, and in every village, township and farm they likewise know the difference between the General Assembly or State Legislature and a local council. When, therefore, the Constitutional Amendment which was adopted on November 6, 1951—not, we repeat, by the citizens of Philadelphia, but by the citizens of the Commonwealth of Pennsylvania—provided that all county officers should continue to perform their duties ". . . *until the General Assembly shall otherwise provide,"* the people of Pennsylvania did not mean "until the citizens of Philadelphia" or "until the City Council of Philadelphia shall otherwise provide"; they meant beyond the peradventure of a doubt what they so unmistakably said: *"until the General Assembly shall otherwise provide."*

After the enactment of the Constitutional Amendment did the General Assembly otherwise provide? The answer to that question is clearly "No". It is clear as crystal that the words of the Constitutional Amendment *"until* the General Assembly *shall otherwise provide"* express a future tense and require a future Act of the Legislature to be passed after November 6, 1951. The City, of course, admits that no Act was passed by the Legislature after November 6 ,1951, which granted the City power to abolish, reorganize or control the Board of Revision of Taxes, but contends that the First Class City Home Rule Enabling Act of *1949,* plus the City Charter, which was adopted not by the General Assembly, but by the citizens of Philadelphia on *April 17, 1951,* were "taken together" "the equiva-

lent" of an Act of the Legislature, "passed after November 6, 1951."

In the first place, if the First Class City Home Rule Act of 1949 could be construed—contrary to its language—to give cities the unrestricted and unlimited right and power to exercise all the powers of local self-government it would be—so far as Philadelphia is concerned—*in direct conflict* with and therefore superseded or impliedly repealed by the provisions of the Constitutional Amendment of 1951 which by its express terms applies specifically and solely to Philadelphia. This Amendment clearly and unambiguously and unequivocally provides, as above noted, that "until the General Assembly shall otherwise provide . . . All county officers shall continue [as city officers of Philadelphia] to perform their duties and be elected, appointed, compensated and organized as may be provided by the Constitution and *by existing laws of the Commonwealth in effect* at the time this Amendment becomes effective."

The City contends first, that the City Charter is, by virtue of the enabling Act of 1949, *the equivalent* of an Act of the General Assembly and hence (by virtue of its adoption on April 17, 1951) was an *existing* law on November 6, 1951, and secondly and irreconcilably, that, although adopted by the *citizens of Philadelphia prior* to November 6, 1951, it was the *equivalent* of an Act of the General Assembly enacted *after* November 6, 1951. The City overlooks (1) that on November 6, 1951 there were approximately a dozen *existing* laws of the Commonwealth which dealt specifically with the Board of Revision of Taxes or with other County offices, and it is these laws to which the Constitutional Amendment clearly and unquestionably refers; and (2) that the City Charter was not enacted by the General Assembly after November 6, 1951.

The fallacy of the City's contention is made even clearer by their further and necessary contention that the latter part of the Constitutional Amendment is no barrier since it merely means that the (former county) officers must be paid until their terms are completed. Suffice it to say that this contention once again completely ignores the clear and controlling language of the Constitutional Amendment that such officers "shall continue to perform their duties and be elected, appointed, compensated or organized . . ."

We find no merit in the contentions of the City in support of this ordinance.

The Board of Revision of Taxes further relies upon the Act of August 26, 1953, P.L. 1476, 53 PS 3422-26, as a further demonstration that the City recognized—until the present suit—that City Council had only such powers of organization, abolition and legislation with respect to former county offices as the General Assembly might provide by an Act of Assembly enacted after November 6, 1951. The Act of 1953, which was passed by the "General Assembly", recited, inter alia: "The purpose of this Act is to carry out the intent and purpose of Article XV, section 1 of the Constitution . . . and Article XIV, section 8 of the Constitution . . . by enabling the Council of the City of Philadelphia . . . to abolish certain, offices, boards and commissions . . ." The Act then *specifically authorized City Council* "to legislate with respect to the election, appointment, compensation, organization, abolition . . . powers, functions and duties of the Coroner, Recorder of Deeds, City Treasurer, Clerk of the Court . . . , and the Board of Inspectors of the Philadelphia County Prison . . ." *Under and pursuant to that Act of the General Assembly,* City Council has abolished and reorganized all of the aforesaid offices except clerk of the Court. The City replies that it sought and obtained Legislative approval in the

Act of 1953 only out of caution and not because City Council was lacking in such power. Since the language of the Constitutional Amendment is clear, we need not consider or further discuss this contention.

The ordinance of City Council approved by the Mayor of Philadelphia on August 16, 1954 is unconstitutional and void.

The Court therefore enters the following Decree:

### DECREE

IT IS ORDERED, ADJUDGED AND DECREED that the Mayor of the City of Philadelphia, the Director of Finance of the City of Philadelphia, and the City Council of Philadelphia, and their officers, agents and employees, are hereby restrained and enjoined from carrying into effect or enforcing any of the provisions of the ordinance enacted by the Council of the City of Philadelphia, and approved by the Mayor on August 16, 1954.

Each party shall pay its, his or their respective costs.

———

CONCURRING OPINION BY MR. CHIEF JUSTICE HORACE STERN:

In *Lennox v. Clark*, 372 Pa. 355, 370, 93 A. 2d 834, 841, we pointed out that by virtue of the City-County Consolidation Amendment all former county offices became a part of the municipal government and what we termed the *"inter* city-county consolidation" was thereby effected. But we added that the *activities* or *functions* of those offices was not changed, that they were to operate just the same as before and continue to perform their duties until the next stage of the project was entered upon, namely, what we termed "the *intra* city consolidation," that is, the reorganization or "streamlining" of the municipal governmental

structure thus enlarged by the acquisition of the former county offices. And we stated that, in view of clause 7 of the Amendment, the question remained whether, in order to accomplish such *"intra* city consolidation," any proposed reorganizations, regroupings, abolitions or mergers of the former county offices, designed the more advantageously to incorporate their functions into the existing municipal structure, would have to wait upon action by the General Assembly. We are now called upon to decide that question.

The Home Rule Act of April 21, 1949, P.L. 665, granted to the City of Philadelphia the right to adopt a charter and thereupon to possess all powers and authority of local self-government, with complete powers of legislation and administration in relation to its municipal functions; it further stated the charter might provide for a form or system of municipal government to the full extent that the General Assembly might legislate in reference thereto and with like effect. Undoubtedly, therefore, *if* the Board of Revision had then been a *city* office, the City of Philadelphia, under the powers thus given by the Act, and having adopted a charter as authorized by it, would have had the power to do what it is now attempting to do by the Ordinance of August 16, 1954, namely, to abolish that Board and transfer its powers and duties to the office of Chief Assessor and the Tax Review Board. But it must be borne in mind that at the time of the adoption of the Home Rule Act the City-County Consolidation Amendment had not yet come into being; therefore the Act had relation, and could have had relation, only to the components of the municipal structure as it then existed and of which the county offices were not a part. On November 6, 1951, the City-County Consolidation Amendment was adopted by the electorate and became a part of the Constitution of the Common-

wealth and thereby the supreme law. It provided that the county offices were abolished and that all their functions were thereafter to be performed by the city. Accordingly, we held in the *Lennox* case that by virtue of the Amendment the *employes* of the county offices automatically became city employes and, as such, subject to all the laws then in existence governing such employes. By the same token, the same result would have been achieved in the case of the county *officers* were it not for the fact that the Amendment, after providing that all the county officers should thereupon become officers of the City of Philadelphia, chose, by Clause (7), to place an express restriction upon the process of *"intra* city consolidation" by providing that *"until the General Assembly shall otherwise provide,"* they should *"continue to perform their duties* and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth *in effect at the time this amendment becomes effective, . . . ."* In other words, what the Amendment practically said was that, although the Home Rule Act of 1949 gave the city the power of determining its own municipal structure, now that the county offices are being added to that structure this is being done subject to the proviso or restriction that the officers should continue to carry out their duties in the same manner as they were then doing under the laws then in effect, which is equivalent to saying that their functions could not be taken over by other persons or agencies until and unless the General Assembly should otherwise so provide. Obviously, upon the abolition of a county office its officers could no longer "continue to perform their duties" as at the time of the adoption of the City-County Consolidation Amendment. Nor were the laws *then* in effect regulating the manner in which the

county officers were to perform their duties in any way altered or affected by the mere fact that the Legislature had previously, in 1949, authorized Philadelphia to adopt a Home Rule Charter. Moreover, it seems to me impossible, in view of the future tense of the verb "shall provide," to interpret Clause (7) as meaning other than that the county officers should continue to perform their duties until the General Assembly should otherwise *thereafter* provide. Speaking as of November 6, 1951, the Amendment evidently intended that any change in regard to the performance of their duties by the county officers would have to be by future action of the General Assembly dealing specifically with that subject.

After the adoption of the Amendment the General Assembly could have provided for the abolition, merging, or regrouping of former county offices within the municipal governmental structure in either one of two ways; it could have itself legislated directly on the subject, or it could have authorized the Council of the City of Philadelphia to do so. It chose to adopt the latter method, and, by the Act of August 26, 1953, P.L. 1476, it vested the Council with "full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties" of several of the former county offices, but it withheld such grant of power in the case of the Sheriff, the City Commissioners, the Board of Revision of Taxes, and the Registration Commission. The vesting in the Council of the power with respect to the other offices was clearly valid.

However illogical or unwise the action of the Legislature may have been in preventing the complete fulfillment of Philadelphia home rule, I am obliged, since the court has no concern with the wisdom of legislation but only with its legality, to concur in the majority opinion.

DISSENTING OPINION BY MR. JUSTICE JONES:

The single question for decision in this case is whether the Council of the consolidated City-County of Philadelphia has the power to allocate by ordinance the functions of a constitutionally abolished County office to a City department or agency created by Council in an exercise of its purported power under the Philadelphia Home Rule Charter. In addition to the Charter, which was adopted by the electors of Philadelphia on April 17, 1951, the other enactments pertinent to a solution of the instant problem are the First Class City Home Rule Act of April 21, 1949, which authorized the Charter, and the City-County Consolidation Amendment of the Constitution adopted November 6, 1951, which was initiated by resolution of the Legislature first passed at the 1949 Session.

The answer to the question here involved is not to be found in finely-spun reasoning from arbitrary legal generalities based on the relative chronology of the adoption or effective dates of the various relevant enactments. Nor does the answer depend upon whether the term "General Assembly", as employed in Clause 7 of the Consolidation Amendment, means "General Assembly",—an inquiry to which the majority opinion so largely devotes itself to the exclusion of the real issue presented. We are all agreed that, of course, "General Assembly" means the General Assembly of the Commonwealth and not the Council of the consolidated City-County of Philadelphia. The proper approach to the problem is contained in the admonition of Mr. Chief Justice STEEN in *Carrow v. Philadelphia,* 371 Pa. 255, 257, 89 A. 2d 496, where he said that "The solution of the legal problem presented is entirely free from difficulty if the controlling enactments are read with an eye to their plain and unequivocal meaning instead of with a straining after forced constructions

and a seeking of ambiguities where none exist." See, also, the same effect *Lennox v. Clark,* 372 Pa. 355, 362, 93 A. 2d 834. The present inquiry, just as in the *Carrow* and *Lennox* cases, is but a part of the same *sui generis* subject-matter. Never before has the problem of integrating home rule into a consolidated city-county government arisen in this State and further consolidations of such nature are not likely to occur. If they do, it can be only by virtue of additional constitutional amendments.

The present question calls for disposition on the basis of a judicial interpretation of the Statute, the Charter and the Amendment with an eye single to the ascertainment of their true intent and purpose. None of our prior decisions forecloses the answer. In fact, the precise question was expressly reserved in *Lennox v. Clark,* supra, for future decision if and when it should justiciably arise.

It is now beyond cavil that Philadelphia's Home Rule Charter, authorized, as it was, by the First Class City Home Rule Act of 1949, clothed the City with power to legislate in respect of matters pertaining to its municipal government as fully as the General Assembly could do in reference thereto and with like effect. Section 17 of the Home Rule Act of 1949 invested the City with power to include in its Home Rule Charter (1) "all powers and authority of local self-government", (2) "complete powers of legislation and administration in relation to its municipal functions", (3) "the exercise of any and all powers relating to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect" and (4) power to "enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the

city by the charter it adopts or by this or any other law." And, Section 1-100 of the Home Rule Charter, in avowed pursuance of the Home Rule Constitutional Amendment of 1922 (Art. XV, Sec. 1) and the First Class City Home Rule Act of 1949, expressly provided that "the City of Philadelphia . . . shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it."

The plaintiffs contend, however, that, because of certain provisions in Clause 7 of the City-County Consolidation Amendment, a further Act of Assembly is required before there can be allocated by Council to a City agency or department the functions of the former County Board of Revision of Taxes notwithstanding that Clause 1 of the Amendment, immediately upon its adoption, abolished forthwith the office and, at the same time, ordained that "henceforth" the City should perform all functions of the office. That the abolition of the office and the transfer of its functions was immediate, no one can deny. As Mr. Chief Justice Stern said in the *Lennox* case, with respect to Clause 1 of the Amendment,—"The crucial words there to be noted are *'hereby'* and *'henceforth.'* The county offices are abolished, not at some indefinite time in the future when a legislative body might so enact, but *'hereby,'* that is, by virtue of the constitutional amendment itself, which in this respect, therefore, is obviously self-executing. It will be further noted that all the functions of county government, that is to say, all the activities or duties theretofore performed by the county officers, are *thenceforth* to be performed by the city; the city is to take over *then and there,* as part of its own government, the performance of the

functions of the county government." Where, then, is the necessity for a further Act of Assembly before the City, in the exercise of its Home Rule powers, can perform the functions which Clause 1 of the Amendment specifically imposed upon it?

The Consolidation Amendment (Article XIV, Section 8) provides in Clause 7 that "until the General Assembly shall otherwise provide", the incumbent officers of the abolished County offices (who by the same Clause became, forthwith, City officers) "shall continue to perform their duties and be elected, appointed, compensated and organized" as provided by the "Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective . . . ." On the basis of that provision, the plaintiffs argue that the Board of Revision of Taxes, as such, continues to exist and that the functions of the office cannot be committed to the City's disposition except by a further Act of Assembly. Plainly enough, the contention not only ignores but, once adopted, will effectively nullify the express language of the first clause of the Amendment which abolished the office and transferred all its *functions* to the City. By what reason or logic can such an interpretation be justified? The majority say Clause 7 is a constitutional provision and therefore supreme. So much may be granted, but that does not make it supreme over Clause 1. Both are integral parts of the same constitutional Amendment and must be read together and reconciled and each given its intended effect. There is not the slightest justification for interpreting Clause 7 so as to nullify the primary purpose of the Amendment as contained in Clause 1, viz., the consolidation of the City and County governments by abolishing the County offices and reposing all of their functions in the City.

There is no conflict between Clause 1 and Clause 7. They respectively apply to different phases of the consolidation. Clause 1 applies to County *offices* all of which it abolished and whose functions it committed to the City with neither qualification nor restriction. Clause 7 applies to the *officers* of the abolished County offices and the duties, powers, etc. of such officers *in a certain contingency* which we shall hereinafter consider. As we observed in *Suermann v. Hadley,* 327 Pa. 190, 193 A. 645,—"There is a vast difference between abolishing an office and removing the incumbents of an office." It was held in that case that, although the terms of the members of the Board of Revision of Taxes could not be terminated without violating Article VI, Section 4, of the State Constitution, the abolition of the office itself was no violation of that constitutional provision—a principle presently recognized by the last part of Clause 7 which permits the County officers serving when the Amendment became effective to complete their terms. It follows that, apart from the portion of Clause 7 hereinbefore quoted, there was no constitutional requirement that the officers of the abolished County offices be permitted to perform any of the duties of their former offices as City officers. What, then, was the intendment of Clause 7 in respect of a possible further Act of Assembly?

The purpose of Clause 7 is both evident and understandable. Indeed, it was a necessity in the circumstances of charter formulation and promulgation, on the one hand, and City-County consolidation, on the other, both of which proceeded more or less abreast for somewhat the same period of time through requisite legislative and electoral processes. When the resolution providing for the submission of the proposed Consolidation Amendment was first introduced at the legislative session of 1949 it obviously could not then be

known and, consequently, was not known whether a home rule charter for Philadelphia under an Act introduced and enacted at the same 1949 legislative session would ever be adopted. Clause 7 of the proposed Amendment was, therefore, advisedly drafted so as to accommodate the situation that would obtain if the Amendment were adopted and the Home Rule Charter defeated. In such a contingency, the City's legislative power would have been no greater than what it possessed under its existing Charter of 1919 and extant statutes applicable to the City. It is manifest, therefore, that with Home Rule rejected, the City would have been without power to integrate in its municipal government the functions of the late County offices which, upon the adoption of the Amendment, became the City's responsibility. It was in that situation that the officers of the abolished County offices were to continue to perform their duties, etc. until the General Assembly provided otherwise as directed by Clause 7. In the other possible contingency, i.e., had the Home Rule Charter been adopted and the Consolidation Amendment been rejected, there would have been no problem. Philadelphia would have operated the City government under the Home Rule Charter instead of its Charter of 1919 and the County government would have continued as theretofore.

What, then, is the course to be pursued for the integration of the functions of the late County offices into the City government since both the Charter and the Amendment were adopted? The answer is plain enough. It is the province of the City Council under the Home Rule Charter to act to that end without the necessity for any further legislation by the General Assembly. And, that is so by virtue of the very provision in Clause 7 which the plaintiffs cite in support of their untenable position.

Clause 7, as already indicated, provided that "until the General Assembly shall otherwise provide", the officers of the abolished County offices were to continue to perform their duties, etc. under the laws of the Commonwealth in effect at the time the Amendment became effective. At that time (viz., November 6, 1951), the First Class City Home Rule Act of 1949 was obviously an existing law of the Commonwealth. That Act had been passed pursuant to the constitutional authority contained in the Home Rule Amendment of 1922 (Article XV, Section 1) which authorized the General Assembly to delegate a part of its legislative authority to local governmental units so that cities might "exercise the powers and authority of local self-government." So much of the Home Rule Amendment as is presently pertinent provides that "Cities . . . may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature." The Home Rule Act of 1949 conferred upon cities of the first class what Mr. Chief Justice STERN aptly characterized in the *Carrow* case as a "sweeping grant of powers" for their home rule, so much so, in fact, that the extent of the authority delegated by the legislature to a city of the first class can be fully appreciated only by reference to the exact wording of Section 17 of the Home Rule Act of 1949 which we have hereinbefore summarized. The power and authority extended by the Home Rule Act to the City of Philadelphia resulted in the drafting of the Home Rule Charter which was duly accepted by the electorate of Philadelphia on April 17, 1951.

The Philadelphia electorate's unqualified acceptance by its vote on the Charter of the legislature's offer

of the Home Rule powers authorized by the Act of 1949 constituted a governmental compact whereby the City of Philadelphia was thenceforth clothed with such powers by virtue of a law in effect prior to and at the time the Consolidation Amendment became effective, albeit the City was not to exercise its accepted powers until January 7, 1952. The postponement of the effective date of the Charter cannot possibly affect the construction of Clause 7 of the Consolidation Amendment. Had the Charter been made effective by its terms, as it readily could have been, any time after its adoption but prior to the vote on the Consolidation Amendment, the contention which the plaintiffs now advance could not have been raised. Constitutional questions do not depend for solution upon a fortuity which has nothing whatsoever to do with the substantive constitutional provision involved.

Nor is there any merit in the suggestion that the offices abolished by the Consolidation Amendment, being *County* offices, were not within the purview of the 1949 Home Rule Act. Such offices, qua *offices,* were completely extinguished by the Consolidation Amendment. It was only the functions of those offices which were placed within the City's governmental competence. Thereby, the former *County* functions became *City* functions and, as such, were subject thenceforth, for their faithful performance, to the City's disposition under its Home Rule powers. City functions properly require city action and that is what the citizens of Philadelphia undoubtedly understood they were attaining when they provided in their Charter that ". . . it is the intention of the electors in adopting this charter that it shall supersede all statutes or parts of statutes, local, special or general, and all ordinances of the City, affecting the organization, government and powers of the City to the extent that they are incon-

sistent or in conflict with this charter": Charter, Section 11-101.

The fact that the City caused the Act of August 26, 1953, P. L. 1476, to be introduced in order to transfer to City departments the functions of the Coroner, Recorder of Deeds, City Treasurer, Clerk of the Court and the Board of Inspectors of the Philadelphia County Prison was done out of an abundance of caution, as the City Solicitor states, and, of course, does not preclude this court from interpreting properly the meaning of Clause 7 of the Consolidation Amendment. In fact, the eminent, bi-partisan Advisory Consolidation Commission deemed it to be an act of caution to request legislation confirmatory of the power of Council so to act, even though such power was expressly conferred by Section 1-102 (2) of the Charter: see Report of the Consolidation Commission, Journal of the City Council [of Philadelphia], 1953.

Being firmly of the opinion that it was entirely within the power of City Council under the Home Rule Charter to enact the ordinance of August 16, 1954, transferring the functions of the former Board of Revision of Taxes to the Office of Chief Assessor and to the Tax Review Board, I would dismiss the complaint.

Mr. Justice CHIDSEY joins in this dissenting opinion.

Mr. Justice MUSMANNO dissents.